# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| ALAN JEFFREY ORTS, ) | |
| JULIE JONES ORTS, ) | |
| ) | Case No. 08-71457-SCS |
| *Debtors.* ) | |
| ) | |
| ) | |
| GLENDA C. BRICKHOUSE, ) | |
| ) | APN 08-07075-SCS |
| *Plaintiff,* ) | |
| ) | |
| v. ) | |
| ) | |
| ALAN JEFFREY ORTS, ) | |
| JULIE JONES ORTS, ) | |
| ) | Chapter 7 |
| *Defendants.* ) | |

## MEMORANDUM OPINION

The trial of the Complaint to Determine the Dischargeability under 11 U.S.C. § 523(a)(2)(B) filed by the plaintiff, Glenda C. Brickhouse (hereinafter "Brickhouse"), against the defendants, Alan Jeffrey Orts ("Mr. Orts") and Julie Jones Orts ("Mrs. Orts") (collectively referred to as the "Debtors"), was conducted on January 21, 2009. At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the trial and of the pleadings submitted by each party, the Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Findings of Fact[1]

The Debtors filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code on May 1, 2008.  Brickhouse was scheduled among the creditors of the Debtors as holding a disputed debt in the amount of $400,000.00 arising in June 2007 by reason of a contract.  On July 31, 2008, Brickhouse filed an amended complaint in this Court to determine the dischargeability of debt owed to her by the Debtors (the "Complaint").[2]

The Complaint alleges on or about May 30, 2007, the Debtors signed an agreement for the purchase of a motorcycle business of Brickhouse (the "Purchase Agreement") and signed a five-year lease for the building where the business was operating (the "Lease").  The Debtors agreed to pay $400,000.00 for the business plus rent of approximately $4,500.00 per month.  Complaint ¶¶ 7-8. The Complaint further alleges the Debtors signed a personal financial statement (the "Financial Statement") on or about May 20, 2007, and delivered it to Brickhouse prior to the closing of the Purchase Agreement and the Lease.  *Id.* ¶ 10.  A copy of the Financial Statement was attached as Exhibit A to the Complaint.  Brickhouse states that in the Financial Statement, the Debtors represented that they had the following sources of income:

    a.  Salary of $125,000

    b.  Real Estate income of $22,500

    c.  Child Support of $1600.00 per month

---

[1]  As a result of the conclusions set forth herein, the Court makes exhaustive findings and references to the trial record, although this would typically be accomplished in a more summary fashion.

[2]  The original Complaint of Brickhouse was filed with this Court on July 28, 2008.  Prior to any answer by the Debtors, Brickhouse filed an amended complaint on July 31, 2008.

    d.  Rental income of $19,200 to increase by 2% per year

    e.  Property payments from divorce of $12,000 per year for 3 more years

    f.  Riptide Security income of $75,000 per year

    for a total annual income of  $253,700.00.

*Id*. ¶ 11.  Brickhouse also alleges that the Financial Statement listed real estate worth $845,000.00 and mortgage debt of $508,400.00 on three pieces of real estate: $205,000.00 on Copperstone Circle; $199,000.00 on Laurelwood Drive; and $104,400.00 on Dodington Court. *Id*. ¶¶ 17, 19.  Brickhouse further alleges that Section 6 of the Financial Statement entitled "Unpaid Taxes" states "None" as does Section 7 of the Financial Statement entitled "Other Liabilities."  *Id*.  ¶¶ 21, 23.  Brickhouse then refers extensively to the bankruptcy schedules filed by the Debtors, asserting that less than a year after the Financial Statement was signed, their bankruptcy schedules depict a far different and weaker financial condition than represented in the Financial Statement.[3]  Brickhouse alleges that the

---

[3]  Brickhouse lists a number of alleged discrepancies in the Financial Statement and later financial information concerning the Debtors in the following enumerated paragraphs of the Complaint:

    13.    The Statement of Financial Affairs signed by the Debtors under penalty of perjury and filed in this case states that their only income in 2006 was $90,885.00 from "Real Estate Sales."

    14.    The 2007 Federal Income Tax Return filed by the Debtors has no salaries or wages.

    15.    The 2007 Federal Income Tax Return filed by the Debtors has no income from Riptide Security.

    16.    The 2007 Federal Income Tax Return filed by the Debtors shows only negative income of $25,875.

    17.    The Statement presented to Plaintiff in May of 2007 listed real estate worth $845,000.

Debtors obtained the property of Brickhouse by use of a financial statement in writing respecting their financial condition that was materially false and that Brickhouse reasonably relied on the statement in selling her business and leasing her building to the Debtors.  Lastly, Brickhouse contends the Debtors caused the Financial Statement to be made with the intention of deceiving Brickhouse.  *Id.* ¶¶ 25-26, 28-29.

In their answer to the Complaint, the Debtors admit that "they signed a draft financial

---

18.    The Schedules filed with the court less than one year later state that the same real estate is really only worth $623,000, a difference of over $220,000.00.

19.    The Statement presented to Plaintiff in May of 2007 listed mortgage debt of $508,400 on the three pieces of real estate:

    a.    $205,000 on Copperstone Circle

    b.    $199,000 on Laurelwood Drive

    c.    $104,400 on Dodington Court

20.    The Bankruptcy Schedules filed by the Debtors in this case under penalty of perjury list the debt secured by these parcels of real estate at $685,945.00, a difference of over $175,000.00.

21.    Section 6 of the Statement entitled "Unpaid Taxes" states "None."

22.    The Bankruptcy Schedules filed by the Debtors in this case under penalty of perjury list tax liability from year 2004 in the amount of $15,345.47.

23.    Section 7 of the Statement entitled "Other Liabilities" states "None."

24.    The Bankruptcy Schedules filed by the Debtors in this case under penalty of perjury list education loans in excess of $12,000 from 1994 and 1996. They indicate credit card debt with Wachovia of over $22,000 and many thousands more of credit card debt, loans and medical services.

Complaint ¶¶ 13-24.

4

statement on or about May 20, 2007 which, if used, was intended to be for the benefit of the Small Business Administration." Answer ¶ 10. The Debtors also admit that a copy of such document was given to Brickhouse. *Id.* The Debtors deny that the Financial Statement was false and that Brickhouse reasonably relied upon the Financial Statement. *Id*. ¶¶ 26, 28.

At the trial, the evidence focused upon two primary areas: (1) whether the Financial Statement was materially false; and (2) whether the Financial Statement was presented to Brickhouse for the purpose of inducing Brickhouse to enter into the Purchase Agreement and Lease and whether Brickhouse relied upon the Financial Statement in extending credit to the Debtors. It is on this critical second inquiry that the evidence presented by the parties was diametrical.

Brickhouse testified she and her late husband began a motorcycle business in 1983 ("Brickhouse Cycles"). Tr. at 6. Mr. Brickhouse died in 2001, and Brickhouse continued to operate Brickhouse Cycles. In 2006, Brickhouse retained a broker to attempt to sell Brickhouse Cycles, but the broker's efforts were unsuccessful. *Id.* at 7-8. Commencing at the end of April 2007, Brickhouse began discussions concerning selling Brickhouse Cycles with Joseph Righetti ("Righetti"), who owned a motorcycle business named Seven City Cycles. Brickhouse advised Righetti that her sales price for Brickhouse Cycles was $400,000.00. *Id.* at 8. Brickhouse transmitted the requested sales price by writing down the amount "$400,000.00" on a piece of paper given to Righetti's then-partner in Seven City Cycles. *Id.* at 36. Righetti at some point advised Brickhouse that he wished to purchase Brickhouse Cycles and that he had a new partner. Thereafter, Brickhouse met Mr. Orts, who, at times along with Mrs. Orts, met with Brickhouse at the business premises of Brickhouse Cycles. Brickhouse admitted she was anxious to sell her business, as she "want[ed] to get out of the business" because it was "stressful" and "a lot of work." *Id.* at 51.

Brickhouse testified that in mid-May 2007, she asked Righetti and his spouse ("Mrs. Righetti") and the Debtors for financial information in the form of a financial statement and income tax returns. *Id.* at 9, 33.

On May 30, 2007, Righetti, Mrs. Righetti, Mr. Orts, and Mrs. Orts (collectively "the Purchasers") met with Brickhouse at Brickhouse's residence ("Closing") in her kitchen.  Also present was Richard Kelly ("Kelly"), Brickhouse's boyfriend, and Brickhouse's son, who did not participate in the meeting. *Id.* at 17.  Brickhouse represented that she asked the proposed purchasers for the requested financial information.  The financial statement supplied by Righetti was not "fully filled out," and no financial information or Social Security Number for Mrs. Righetti appeared thereupon.  Brickhouse testified she did not receive any tax returns from the Righettis. *Id.* at 213. Brickhouse testified she did receive the Financial Statement from the Debtors, which was on a United States Small Business Administration form signed and dated by them. *Id.* at 10.  Brickhouse did not receive any tax returns nor did she receive any business plan or projections from the proposed Purchasers.  Brickhouse testified she looked over the Financial Statement and that she and Kelly asked questions about it, including inquiries about Mr. Orts's security business and his vending machine business; Mrs. Orts's income and child support from her ex-husband; and the Debtors' home equity. *Id.* at 10-13.  The Debtors' home equity, according to Brickhouse, was "the only reason their statement looked so good." *Id.* at 13.  Brickhouse was told by Mr. Orts that the vending machines listed on the Financial Statement were located in schools, and this business "was a cash cow." *Id.*  Brickhouse asked Mr. Orts how he could be so young and have so much, to which Mr. Orts replied that "they worked hard." *Id.*  Brickhouse further testified that thereafter changes in the Purchase Agreement and the Lease were discussed and agreed to, and Brickhouse several

6

times adjourned to the upstairs of her home to make changes to these documents utilizing her computer. Brickhouse estimated the meeting consumed two to three hours. *Id.* at 44. Brickhouse testified she would not have sold Brickhouse Cycles if the Debtors did not have the assets they claimed to have. *Id.* at 214.

The Purchase Agreement and the Lease were executed that evening, and the Purchasers began operations at Brickhouse Cycles within a day or two. *Id.* at 14-15, 39. The Purchase Agreement provided that Mr. Orts, Mrs. Orts, Righetti, and Mrs. Righetti would purchase the assets of Brickhouse Cycles for the total amount of $400,000.00, with a payment of $150,000.00 towards the purchase price due on or before January 1, 2008. *Id.* at 8, 31. The Purchasers would begin operating at the Brickhouse Cycle premises on June 1, 2007. *Id.* at 14. Monthly rent of $4,500.00 for the premises was to be paid to Brickhouse, along with a security deposit of $4,500.00 that was to be paid in four monthly installment payments of $1,145.00. *Id.* at 16. The installment payments for the security deposit was a change requested by the Purchasers, who said "they would rather make payments on the security deposit to be able to use the money that they had into the business." *Id.* at 30.

The Purchasers shortly experienced financial difficulties and defaulted on the Purchase Agreement and lease payments to Brickhouse in the fall of 2007. Brickhouse initiated legal proceedings in November 2007 and ultimately reentered and took possession of the leased premises in February 2008. *Id.* at 17-20. Brickhouse testified the premises were trashed, equipment disabled, and much of the parts inventory was no longer on the premises. Brickhouse additionally testified she performed extensive repairs at the premises amounting to $21,130.40 and sold some of the remaining inventory to reduce the indebtedness owed her, the proceeds of which totaled

$38,660.70.[4]    *Id.* at 20-23.   Brickhouse testified she received payment from the Purchasers of $4,000.00 toward the $400,000.00 purchase price for Brickhouse Cycles.  *Id.* at 19.  Finally, Brickhouse testified extensively concerning the differences between the values shown on the Financial Statement and the schedules and statement of financial affairs filed by the Debtors in their bankruptcy case.  *Id.* at 26-29.

Richard Kelly's testimony was largely identical to that of Brickhouse concerning the circumstances of the Closing.  Kelly testified the Financial Statement was given by itself without any other documents.  Kelly saw the Financial Statement, and "we went over the financial statement with the Orts and with Glenda [Brickhouse]," discussing the properties and businesses listed thereupon, the income listed, looked at the "debt ratio" shown , "their bottom line on what their net worth was," and "evaluated the real estate at that time." *Id.* at 54-55.  Kelly stated "[w]e had come to a decision that the net worth was approximately $400,000.00 that they had on their financial statement," and he advised Brickhouse that the Purchasers "should have enough backing to be able to come after them, . . . if something went wrong." *Id.* at 55-56.  Kelly also testified that the vending machine, real estate, and security businesses of the Debtors were discussed.  Kelly concluded "[t]he amount of income [of the Orts] was substantial to what current people make, . . . in that household nowadays." *Id.* at 57-58.  Finally, Kelly testified the Purchasers were anticipating a small business loan, and Kelly offered to assist in that regard, having previously obtained a Small Business Administration ("SBA") loan for one of his businesses.  *Id.* at 64.

Mrs. Orts testified the Financial Statement was not completed for the purpose of providing

---

[4]  Brickhouse testified she realized $30,243.00 from her sale of the remaining inventory and $8,417.70 from a subsequent auction of the final remaining personal property at Brickhouse Cycles.  Tr. at 23.

it to Brickhouse, but rather was prepared to be given to Resource Bank to obtain a small business loan. *Id*. at 69, 188. Mrs. Orts indicated originally when the purchase of Brickhouse Cycles was discussed, financing was to be obtained from a brother-in-law. Such financing was not forthcoming, and Brickhouse suggested the purchasers consider an SBA loan. Mrs. Orts contacted Resource Bank and discussed the possibility of an SBA loan with one of Resource Bank's officers, Michael Austin ("Austin").[5] Austin referred Mrs. Orts to the website of Resource Bank to obtain application materials, including a blank personal financial statement, which she attempted to fill out. *Id*. at 83. Mrs. Orts had questions about completion of the Financial Statement and was unsure where on the Financial Statement certain debts should be listed, such as a second deed of trust securing a line of credit made by TowneBank to enable Mr. Orts to purchase a vending machine business. Mrs. Orts testified that in a discussion with Austin, he advised her that Resource Bank would not be interested in loaning monies based upon the value of the parts inventory of Brickhouse Cycles, and Mrs. Orts ceased any further efforts to obtain a loan from Resource Bank. Apparently the loan application materials obtained by Mrs. Orts from the Resource Bank website, including the Financial Statement, were never submitted to Resource Bank. *Id*. at 70-71, 85-86. Mrs. Orts further testified she approached TowneBank and completed a loan application, but TowneBank quickly indicated its lack of interest in financing the acquisition of the assets of Brickhouse Cycles.[6] Mrs. Orts testified she

---

[5] Resource Bank is now known as Fulton Bank.

[6] Mrs. Orts prepared a financial statement for TowneBank to obtain the earlier TowneBank Line of Credit, which document was introduced into evidence ("TowneBank Statement"). The TowneBank Statement reflected student loans owed by Mrs. Orts and the credit line with Wachovia Bank secured by the Debtors' personal residence used to purchase the vending machines operated by Mr. Orts (which was listed under auto loans). The TowneBank Statement was unseen by Brickhouse prior to the purchase of Brickhouse Cycles. Tr. at 71-75.

9

informed Brickhouse of the position of Resource Bank and TowneBank as to their lack of interest

in financing motorcycle parts and that Brickhouse asked her to bring the loan application package

to show Brickhouse that Mrs. Orts had tried to finance with those banks.  *Id*. at 86.  Mrs. Orts stated

the loan package was one to two inches thick and was delivered to Brickhouse at the Closing at

Brickhouse's residence.  Brickhouse purportedly set the package, including the Financial Statement,

on a counter in her kitchen.  Mrs. Orts testified that there were no questions asked about the

Financial Statement.  This package also included business plans and projections.  *Id.*

Mrs. Orts testified extensively about the Financial Statement and her and her husband's

financial condition.  Mrs. Orts admitted she and Mr. Orts signed the Financial Statement on May

20, 2007.  *Id*. at 71.  The Financial Statement showed that the Debtors received $106,200.00

annually from three sources: $75,000.00 from Riptide Security, and child support in the amount of

$1,600.00 monthly and property payments in the amount of $12,000.00 annually, each from Mrs.

Orts's former husband.  *Id*. at 91.  Mrs. Orts admitted she had never received $12,000.00 from her

ex-husband in any one year period.  *Id*. at 78, 92-93.  The Financial Statement also listed "salary"

as $125,000.00 annually.  *Id*. at 88.  Mrs. Orts admitted in her testimony she and Mr. Orts had never

made more than $100,000.00 from real estate sales alone in any one year.  *Id.* at 93.  Mrs. Orts also

testified the "salary" amount of $125,000.00 on the Financial Statement included monies other than

those earned from real estate sales, including $6,000.00 from teaching for the City of Virginia Beach

by Mrs. Orts.  *Id*. at 89, 93.  Mrs. Orts also admitted the Financial Statement did not list her

education loans, which were listed on her bankruptcy schedules in an amount of $13,000.00 to

$15,000.00, because she did not see a place on the form for a "federal loan."  *Id*. at 193.

The most significant testimony of Mrs. Orts concerning the Financial Statement dealt with

the disclosures concerning her personal residence, listed as "Property A" on page two of the Financial Statement. "Property A" listed one mortgage to Countrywide Home Loans with a balance of $205,000.00 and a present market value of the real estate of $430,000.00. Undisclosed was a loan from TowneBank in the amount of $130,000.00, which was incurred in February or March of 2007 and secured by a second deed of trust on "Property A" ("TowneBank Line of Credit"). The proceeds of this loan were utilized to pay off an equity line to Wachovia Bank and to purchase the vending machines shown on the Financial Statement. *Id*. at 69, 73, 188-89. Mrs. Orts testified that this loan does not appear on the Financial Statement (*id*. at 188-89), and she did not know where on the Financial Statement this loan should be listed. There were "several things on this financial statement [she] didn't understand," and she intended to make inquiry to Resource Bank in this regard. *Id*. at 69-71. In support of her contention that the Financial Statement was a draft, Mrs. Orts cited to various blanks on the first page, including the "net worth" figure which was not completed. *Id.* at 190-91. Mrs. Orts could not recall if the Financial Statement had been signed before or after Mrs. Orts learned of Resource Bank's disinterest in making an SBA loan. *Id*. at 71. The Financial Statement also listed "None" as to "Other Liabilities." Mrs. Orts confirmed she and her husband scheduled some unpaid taxes on their bankruptcy schedules, but provided a lengthy explanation that the tax return for Riptide Security had been audited, and she did not believe any taxes were owed. *Id.* at 192-93. Mrs. Orts denied any intention to deceive Brickhouse as to her or her husband's financial condition. *Id*. at 194.

Michael Austin, an officer at Fulton Bank ("Austin"), testified he had never received a loan application package from the Debtors. Austin had discussions with Mrs. Orts concerning the type of assets the bank would want as collateral for a loan, and Austin advised Mrs. Orts that "typically

when we finance an acquisition of a business, we want assets other than just the business assets as our collateral because of what we associate the risk of these type of transactions being." *Id.* at 110.

Mr. Orts testified the purchase of the assets of Brickhouse Cycles was structured such that the Purchasers did not have to pay any money up front: "We were going to try to obtain a small business loan and then she [Brickhouse] was going to finance us on her own and basically a pay-as-you-go; as we made money in the shop, we paid her." *Id.* at 165. Mr. Orts also believed it was the Purchasers' intention to obtain a small business loan to pay the balloon payment due to Brickhouse in January 2008. *Id.* at 166. Mr. Orts testified that Brickhouse did not ask him, Mrs. Orts, or the Righettis for a personal financial statement. *Id.* Mr. Orts also testified that Mrs. Orts brought with her to Brickhouse's residence a small business loan package that was half an inch thick as Brickhouse wanted to see if the purchasers had applied for a small business loan. *Id.* at 168, 174. The contents of this loan package were unknown to Mr. Orts. *Id.* at 169. Mr. Orts testified there was no discussion of any personal financial statements at the Closing and that the Financial Statement was a rough draft filled out "to help proceed forward in obtaining the small business loan." *Id.* at 169, 171-72. On cross-examination, Mr. Orts testified that Brickhouse was given copies of the 2004 and 2005 income tax returns. *Id.* at 176. Mr. Orts admitted Mrs. Orts had education loans that she incurred prior to the Closing that were not listed on the Financial Statement. *Id.* at 185-86.

Mrs. Righetti testified she attended the Closing at Brickhouse's residence, which lasted about one and a half hours. *Id.* at 120. Mrs. Righetti stated Brickhouse requested a tax return from herself and Mr. Righetti and that Brickhouse never requested a personal financial statement from her or Mr. Righetti. *Id.* at 118, 127-28. Mrs. Righetti never heard Brickhouse request a personal financial

12

statement from Mr. Orts or Mrs. Orts.  *Id.*  However, when asked "[d]id you hear Mr. Kelly or anybody who might have spoken on her [Brickhouse's] behalf asking the Ortses for a personal financial statement?", Mrs. Righetti replied "[j]ust Mr. Kelly."[7]  *Id.* at 119.  The tax return of the Righettis requested by Brickhouse was handed to Brickhouse at Closing, which Mrs. Righetti stated Brickhouse put aside.  *Id.* at 120.  Mrs. Righetti stated nothing was discussed at Closing concerning the personal finances of the Purchasers (*id.* at 122, 125) and that Mrs. Orts brought in a box of papers that was placed on a side counter, but Mrs. Righetti did not see either Mr. Orts or Mrs. Orts hand any papers to Brickhouse.  *Id.* at 123.  Mrs. Righetti confirmed the operations of the purchased business were unsuccessful and stated that the business only made a third of what had been represented by Brickhouse.  *Id.* at 123-24.

Righetti also testified neither Brickhouse nor Kelly ever asked for financial information from the Purchasers.  *Id.* at 138-39.  Righetti did not recall Mrs. Orts providing any documents and stated there was no discussion of personal financial statements at Closing.  *Id.* at 140-41.  Righetti believes that Brickhouse misled the Purchasers as to the profitability of Brickhouse Cycles.  *Id.* at 142, 153.

Accordingly, the Court is confronted with the resolution of diametrically contrasting versions of the events surrounding the Closing on the critical issue of the circumstances of how Brickhouse came into possession of the Financial Statement and whether she relied upon the Financial Statement

---

[7]  The examination continued:

Q. "Mr. Richard Kelly?"

A. "I'm sorry.  I didn't know his last name.  Oh, no."

Tr. at 119.

in extending credit for the purchase of the assets of Brickhouse Cycles.  This matter, unique in this

Court's experience, presents the factual issue of whether the creditor in this instance actually

required the furnishing of a financial statement in writing as part of this credit transaction.  These

elements, as well as the other requirements under 11 U.S.C. § 523, are considered hereafter.

### Conclusions of Law

This Court has previously examined the goal of balancing the fresh start contemplated by

the Bankruptcy Code with the necessity that recipients of a fresh start have acted honestly in their

financial dealings:

> One of the most important benefits of the Bankruptcy Code is its ability to offer
> debtors a fresh start.  This concept of a fresh start demands that courts construe
> exceptions to discharge narrowly against the objecting creditor and in favor of the
> debtor.  Courts balance this belief in a fresh start with the principle that "perpetrators
> of fraud are not allowed to hide behind the skirts of the Bankruptcy Code."

*Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62, 81 (Bankr. E.D. Va. 2005) (citations omitted).

Exceptions to a debtor's discharge are to be narrowly construed, and doubt is to be resolved in the

debtor's favor.  *Bayer Employees Fed. Credit Union v. Sapp* (*In re Sapp*), 364 B.R. 618, 625 (Bankr.

N.D. W. Va. 2007) (citing *Bellco First Fed. Credit Union v. Kaspar* (*In re Kaspar*), 125 F.3d 1358,

1361 (10th Cir. 1997) (explaining that the rule of narrow construction is based on the "fresh start

objectives of bankruptcy")).

The exception at issue in the instant matter is 11 U.S.C. § 523, which makes debts non-

dischargeable any debt:

> (2)      for money, property, services, or an extension, renewal, or refinancing of
>          credit, to the extent obtained by–
>
> . . . .
>
>          (B)      use of a statement in writing–

14

(i)     that is materially false;

(ii)    respecting the debtor's or an insider's
        financial condition;

(iii)   on which the creditor to whom the debtor is
        liable for such money, property, or services,
        or credit reasonably relied; and

(iv)    that the debtor caused  to be made or
        published with intent to deceive. . . .

11 U.S.C. § 523(a)(2)(B) (2009).  Under Federal Rule of Bankruptcy Procedure 4005, the plaintiff

has the burden of proving that a debt is non-dischargeable in bankruptcy.  Further, Section 523(a)

requires that the plaintiff prove nondischargeability by a preponderance of the evidence.  *Grogan

v. Garner*, 498 U.S. 279, 287-88 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th

Cir. 1994); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988); *Whitson v. Middleton* (*In re

Middleton*), 100 B.R. 814, 818 (Bankr. E.D. Va. 1988).  Therefore, Brickhouse must prove by a

preponderance of the evidence that the provisions of Section 523(a)(2)(B) apply in this case.

Judge Alquist has recently noted the requirement of the Fourth Circuit Court of Appeals that

<u>all</u> the elements of 11 U.S.C. § 523(a)(2)(B) must be proven for a debt to be deemed non-

dischargeable:

> The Fourth Circuit has recently addressed the § 523(a)(2)(A) dischargeability
> exception (a section the court acknowledges it has had infrequent occasion to
> consider) and explained that in order to establish the non-dischargeability of a debt
> pursuant to this section, the creditor must establish all five elements of fraud as
> follows: (i) a false representation by the debtor, (ii) knowledge that the
> representation was false, (iii) intent to deceive, (iv) justifiable reliance by the creditor
> on the representation, and (v) a showing that the representation was the proximate
> cause of damages.  *In re Rountree*, 478 F.3d 215, 218 (4th Cir. 2007).

> The *Rountree* court also emphasized the importance of ensuring that each
> element of § 523(a)(2)(A) is proved by a preponderance of the evidence.  In

15

*Rountree*, it was undisputed that the debtor had engaged in fraud as against the creditor and that the fraud resulted in a debt owing from the debtor to the creditor. *Rountree* at 222. The Fourth Circuit determined that merely having engaged in fraud was not sufficient to prove the § 523(a)(2)(A) dischargeability exception; the debt also must fit within the mandate of the statute. *Id.* at 224. In *Rountree,* the plaintiff failed to prove that the debt was "obtained by" fraud. *Id.*

> *Rountree* makes it clear that deceit, standing alone, is not sufficient. Each element of the "fraud exception" must be proven in order for the exception to apply. "Since all of the elements must be sustained, a bankrupt may give a materially false financial statement in writing, know it is false and inten[ded] out-and-out to deceive, yet if the creditor did not rely upon the statement, the debt is still discharged." *In re Smith*, 2 B.R. 276, 279 (E.D. Va. 1980) (internal citation omitted).

*Columbo Bank, FSB v. Sharp* (*In re Sharp*), Adversary No. 03-1098, 2007 WL 2898704, at *3 (Bankr. D. Md. Sept. 28, 2007) (footnote omitted).

In addition to the specific elements set forth in the statute, the Court has held that a plaintiff must "prove the debtor was under a duty to furnish a financial statement as part of the credit transaction." *Global Express Money Orders, Inc. v. Davis* (*In re Davis*), 262 B.R. 673, 679 (Bankr. E.D. Va. 2001) (quoting *Se. Assocs. of Durham v. Jacobe* (*In re Jacobe*), 121 B.R. 299, 304 (Bankr. E.D. Va. 1990)). This latter element has often been incorporated in the element focusing on whether the creditor reasonably relied on any financial statement. *See Riggs Nat'l Bank of Washington, D.C. v. Ross* (*In re Ross*), 180 B.R. 121, 128 (Bankr. E.D. Va. 1994) (quoting *Paterno Imports, Ltd. v. McBee* (*In re McBee*), 167 B.R. 827, 830 (Bankr. E.D. Va. 1994)).

**1.      Did the Debtors Use a Written, Materially False Statement Respecting Their Financial Condition?**

The Court will address the first two elements with regard to a written financial statement together. For a debt to be declared non-dischargeable under Section 523(a)(2)(B), a statement regarding the financial condition of the debtor must be in writing. In *Engler v. Van Steinburg* (*In re Van Steinburg*), 744 F.2d 1060 (4th Cir. 1984), the Fourth Circuit Court of Appeals took a broad

16

approach as to what constitutes a statement regarding financial condition. *Id*. at 1060-61. The Court points out that Congress did not speak merely in terms of "financial statements" but rather, "referred to a much broader class of statements—those 'respecting the debtor's financial condition.'" *Id.* at 1061. Therefore, the Court held that, while a statement that specific assets are unencumbered is not a "formal financial statement, such as a typical balance sheet or a profit and loss statement," such statement certainly qualifies as a statement of financial condition, since whether assets are encumbered "may be the most significant information about [the debtor's] financial condition." *Id.* at 1060-61. The Financial Statement here unquestionably fulfills the requirements to constitute a statement in writing concerning the financial condition of the Debtors.

The Court has defined a materially false statement as "'one that paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'" *In re Ross*, 180 B.R. at 127 (quoting *I.H. Mississippi Valley Credit Union v. O'Connor* (*In re O'Connor*), 149 B.R. 802, 807 (Bankr. E.D. Va. 1993)). Such statements that have previously been found to constitute materially false statements include the omission of several million dollars in guaranties on a financial statement to a lending institution (*In re Ross*, 180 B.R. at 127-28); and asserting ownership of property that the debtor did not, in fact, own (*Citizens Bank of Maryland v. Broyles* (*In re Broyles*), 55 F.3d 980, 981-83 (4th Cir. 1995)).

A review of the Financial Statement and the evidence at trial indicates the Financial Statement is materially false. Most significantly, the Financial Statement omits the credit facility provided by TowneBank in the amount of $130,000.00 used to purchase the vending machines, the repayment of which was secured by a second deed of trust on the Debtors' personal residence. It is certain this loan was made prior to the date of the Financial Statement and the Closing.

17

Accordingly, instead of the $225,000.00 in equity in their personal residence reflected in the

financial statement, in reality the Debtors had equity of not more than $95,000.00.[8]  The Financial

Statement also overstated the Debtors' income[9] and failed to disclose the pre-existing education

loans of $13,000.00 to $15,000.00 of Mrs. Orts.[10]  Taken together, these discrepancies rise to the

level of material misrepresentation.

**2.      Did the Debtors Publish the Financial Statement with the Intent to Deceive?**

As with the requirement under Section 523(a)(2)(A) of the Bankruptcy Code, Section

523(a)(2)(B) also requires a showing that the debtor intended to deceive the creditor.  Such may be

shown by proving that the debtor knew that the written statement he was making was false or that

he recklessly made such statement.  The showing of intent to deceive under this section, as under

Section 523(a)(2)(A), may be proven by persuasive circumstantial evidence.  *In re Ross*, 180 B.R.

at 129-30 (citing *Bartl v. Garfinkel* (*In re Claxton*), 30 B.R. 199, 212 (Bankr. E.D. Va. 1983)).

Under Section 523(a)(2)(B), the Fifth Circuit Court of Appeals has held that "'intent to deceive may

be inferred from use of a false financial statement.'"  *Morrison v. W. Builders of Amarillo, Inc.* (*In*

*re Morrison*), Case No. 07-51118, 2009 WL 103693, at *5 (5th Cir. Jan. 16, 2009) (quoting *In re*

----

[8]  The Financial Statement lists the market value of the Debtors' personal residence as
$430,000.00, with a mortgage balance of $205,000.00, for a represented equity of $225,000.00.
Had the existing line of credit with TowneBank in the amount of $130,000.00 been listed, the
equity in their personal residence would instead be $95,000.00.

[9]  The Financial Statement showed salary income of $125,000.00 annually, in addition to
income from real estate of $22,500.00; income of $75,000.00 from Riptide Security; and child
support in the amount of $1,600.00 monthly and property payments in the amount of $12,000.00
annually from Mrs. Orts's former husband.  Mrs. Orts admitted, however, that she and Mr. Orts
had never made more than $100,000.00 from real estate sales alone in any one year.  Tr. at 93.

[10]  Mrs. Orts admitted the Financial Statement did not list her education loans because she
did not see a place on the form for a "federal loan."  Tr. at 193.  These loans were listed on the
bankruptcy schedules in the approximate amount of $13,000.00.

*Young*, 995 F.2d 547, 549 (5th Cir. 1993)).  The Court may examine the totality of the circumstances and infer an intent to deceive when "'[r]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine' to produce such an inference." *Id.* (quoting *Norris v. First Nat'l Bank* (*In re Norris*), 70 F.3d 27, 31 n.12 (5th Cir. 1995)).

The Fourth Circuit Court of Appeals has held similarly:

> A debtor will rarely admit that he intended to deceive a creditor.  Courts have thus held that intent to deceive under § 523(a)(2)(B) can be inferred from the totality of the circumstances surrounding the debtor's acts, including the debtor's knowledge of or reckless disregard for the accuracy of his financial statements. *See In re Cohn*, 54 F.3d 1108, 1119 (3d Cir. 1995) ("[A] creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial statement of the debtor when the totality of the circumstances supports such an inference."); *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994) ("Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inferrence [*sic*] of intent [to deceive].") (quoting *In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989) (correction in original)); *In re Batie*, 995 F.2d 85, 90 (6th Cir. 1993) ("[S]ection 523(a)(2)(B)(iv) is met if a debtor is reckless when submitting financial statements that he knows are not true, not only if the debtor possesses a subjective intent to deceive.").

*Consol. Bank & Trust Co. v. Dalton* (*In re Dalton*), No. 99-1330, 2000 WL 191850, at *3 (4th Cir. Feb. 17, 2000) (unpublished table decision).  "Further, '[t]he debtor's unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts.'" *Cent. Nat'l Bank & Trust Co. of Enid, Okla. v. Liming* (*In re Liming*), 797 F.2d 895, 897 (10th Cir. 1986) (citing 3 Collier ¶ 523.09[5][b], at 523-62).

Here both Mr. Orts and Mrs. Orts expressly disclaim any intent to deceive Brickhouse by reason of the Financial Statement.  The Financial Statement appears to have been prepared in a reckless fashion; it omits material liabilities of the Debtors as to the credit line secured by a second

19

deed of trust on their personal residence and Mrs. Orts's student loans. All of these liabilities were

incurred prior to the signing of the Financial Statement and were well-known to the Debtors. Their

omission is conspicuous, and Mrs. Orts's explanation of not knowing where to place these liabilities

on the Financial Statement is not particularly credible. The significant exaggeration of the Debtors'

income on the Financial Statement also appears to exhibit a reckless indifference to the truth on their

part. Despite their conclusory protestations of a lack of intent to deceive, the completion of the

Financial Statement and the serious omissions and exaggerations therein convince the Court the

Financial Statement was prepared with such reckless indifference so as to impute upon the Debtors

the intent to deceive. However, the salient question then becomes, to deceive whom? Was the

Financial Statement intended to induce Brickhouse to enter into the Purchase Agreement and Lease,

or was it intended to be used to obtain a Small Business Administration loan from someone other

than Brickhouse? Accordingly, resolution of this dispute dissolves to a discrete task of determining

whether Brickhouse has carried her burden of proving by a preponderance of the evidence that the

Financial Statement was provided as a required part of this credit transaction to Brickhouse by the

Debtors with the intent to deceive Brickhouse and that Brickhouse reasonably relied on the Financial

Statement to enter into the Purchase Agreement and the Lease.

**3.** **Did Brickhouse Reasonably Rely on Any Written Statement of Financial Condition
Made by the Debtors?**

Section 523(a)(2)(B) expressly imparts a "reasonable person" standard upon the analysis

under this subsection. In *Field v. Mans*, 516 U.S. 59 (1995), the Supreme Court contrasted the

reasonable reliance standard with that of justifiable reliance. In the discussion, the Court focused

on the stricter aspect of the reasonable reliance standard, which requires a showing that reliance was

reasonable under the "hypothetical average person" standard. *Id.* at 71-75. To establish reasonable

20

reliance upon a false statement of financial condition, a creditor must prove that reliance was objectively reasonable and that there was actual reliance. *I.H. Mississippi Valley Credit Union v. O'Connor* (*In re O'Connor*), 149 B.R. 802, 809 (Bankr. E.D. Va. 1993) (citing *Dominion Bank v. Wingo* (*In re Wingo*), 112 B.R. 141 (W.D. Va. 1990)). Reasonable reliance is to be objectively determined by the fact finder given the totality of the circumstances. *Id.* (citing *Fed. Deposit Ins. Corp. v. Figge* (*In re Figge*), 94 B.R. 654, 665 (Bankr. C.D. Cal. 1988)).

As noted above, another aspect of reasonable reliance is whether the creditor required the debtor to furnish a financial statement as part of the credit transaction. *See In re Ross*, 180 B.R. at 128 (quoting *Paterno Imports, Ltd. v. McBee* (*In re McBee*), 167 B.R. 827, 830 (Bankr. E.D. Va. 1994)); *Se. Assocs. of Durham v. Jacobe* (*In re Jacobe*), 121 B.R. 299, 304 (Bankr. E.D. Va. 1990). Incumbent within this showing is that the financial statement "must have been a substantial consideration or a contributory cause for the creditor's accepting the transaction." *In re Ross*, 180 B.R. at 128 (quoting *In re McBee*, 167 B.R. at 830).

### 4.    Conclusion

The instant proceeding presents a most difficult factual determination on the issue of reliance. Brickhouse and the Debtors presented diametrical testimony as to whether the Financial Statement was required by Brickhouse, with each version corroborated by their respective confederates, Kelly and the Righettis. The Court has exhaustively searched the record here to find <u>any</u> other evidence that would tend to prove or disprove the testimony of Brickhouse and Kelly and the Orts and the Righettis. This search has for the most part been to no avail.[11] The Court finds as

---

[11] The sole nugget found is the testimony of Mrs. Righetti when asked by counsel for the Debtors, "[d]id you hear Mr. Kelly or anybody who might have spoken on her [Brickhouse's] behalf asking the Ortses for a personal financial statement?", and Mrs. Righetti replied "[j]ust

a finding of fact that both Brickhouse's version of events and that of the Debtors are equally credible. "[T]he elements of Section 523(a)(2)(B) are stated in the conjunctive, [and] the burden is upon the plaintiff to prove each element." *AVCO Fin. Servs., Inc. v. Abdul'Faruq* (*In re Abdul'Faruq*), 175 B.R. 618, 622 (Bankr. E.D. Va. 1994) (citing *Zedd v. Sandler* (*In re Sandler*), 143 B.R. 67, 69 (Bankr. E.D. Va. 1992)). *See also Ullman v. Boyer* (*In re Boyer*), No. 98-34241S, 1999 WL 33954735, at *10 (E.D. Va. Aug. 24, 1999). "[I]f an objecting creditor fails to establish every essential fact and element contained in the statutory provision relied upon to except a particular debt from discharge by a preponderance of the evidence, the entire indebtedness is readily dischargeable notwithstanding the fact that certain facts or elements may have been established with the requisite degree of proof." *Schaff v. Olheiser* (*In re Olheiser*), No. 94-30625, 1995 WL 1943422, at *4 (Bankr. D.N.D. July 7, 1995). "Preponderance of the evidence" has been defined as "evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate. [When] the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden of proof." *Smith v. United States*, 726 F.2d 428, 430 (8th Cir. 1984). The Court finds as a finding of fact that the evidence as to whether Brickhouse in fact required the Financial Statement as a condition of the transactions of the Lease and the Purchase Agreement and reasonably relied upon it is at equipose. *See In re Abdul'Faruq*, 175 B.R. at 623-24 (finding that the corporate plaintiff failed to show by a preponderance of the evidence that it reasonably relied upon the defendants' written credit

---

Mr. Kelly." Tr. at 119. However, when reading all of the testimony of Mrs. Righetti, and particularly the testimony immediately following this answer, it does not appear this response, which is inconsistent with other testimony of Mrs. Righetti, is sufficient to tip the balance on this issue of reliance.

application and stating that, upon weighing conflicting testimony, the Court was "not inclined to disbelieve either party's version of oral statements made during the application process"). Therefore, the Court must determine Brickhouse has failed to prove the necessary element of reliance by a preponderance of the evidence.

### SUMMARY

The Court has determined Brickhouse has failed to prove by a preponderance of the evidence that the Debtors delivered the Financial Statement to Brickhouse to induce the transaction here and that Brickhouse reasonably relied upon the Financial Statement in deciding to enter into the Purchase Agreement and the Lease. Accordingly, the Court finds that the indebtedness of the Debtors to Brickhouse should be discharged.

A separate order will be entered consistent with the findings and conclusions contained in this Memorandum Opinion.

The Clerk is ORDERED to forward a copy of this Memorandum Opinion to Carolyn L. Camardo, counsel for Brickhouse; to Michael P. Cotter, counsel for the Debtors; and to Debera F. Conlon, Assistant United States Trustee.

**Entered this 24th day of February, 2009, at Norfolk, in the Eastern District of Virginia.**

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

23